1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| LAURA L. TIMLICK, an unmarried woman, Plaintiff, | CASE: 3:16-cv-05797-BHS |
| vs. | [**SECOND** AMENDED] COMPLAINT [JURY DEMAND] |
| BANK OF AMERICA, N.A., a foreign corporation; RESIDENTIAL CREDIT SOLUTIONS, INC., a foreign corporation; THE BANK OF NEW YORK MELLON, fka The Bank of New York, as Trustee for the Certificateholders of CWMBS, Inc., CHL Mortgage Pass-Through 2007-10, a national association;  RENEE M. PARKER, a resident of California, and NORTHWEST TRUSTEE SERVICES, INC., a Washington corporation. | |
| Defendants. | |

COMES NOW, LAURA L. TIMLICK, an unmarried woman, hereinafter "Plaintiff," by and through the undersigned counsel, file*s* this lawsuit seeking declaratory judgment and damages resulting from the defendants' unfair and deceptive business practice of loan servicing, including the process of consumer's application for loss mitigation, and foreclosure, which are designed to divest real property from homeowners such as Plaintiff without just cause and

[**SECOND** AMENDED] COMPLAINT                    1

without compliance with applicable laws.

## PARTIES, JURISDICTION AND VENUE

1.      Plaintiff is a resident of Washington, she owns and has been living at the real property known as 8906 Command Point Road, Olalla, WA 98359 ("Plaintiff's homestead," "Property"), since she purchased it in 2005.

2.      Defendant BANK OF AMERICA, N.A., and ("BANA") is a financial and banking conglomerate which owns and/or services millions of residential loans on behalf of other entities.  BANA's headquarters is in the State of North Carolina, USA. BANA is not the original lender but has been acting as the loan servicer of Plaintiff's mortgage loan.

3.      Defendant RESIDENTIAL CREDIT SOLUTIONS, INC. ("RCS") is a corporation with headquarters in Fort Worth, Texas. RCS serviced thousands of residential mortgage loans and acted as the default servicer of plaintiff's mortgage loan.

4.      Defendant RENEE M. PARKER ("Parker") is a resident of California who represents in her letterhead that she is admitted to practice law is several states including California and Washington.  Upon information and belief, Parker was or has been personally taking actions to thwart Plaintiff's efforts to short sell her homestead in order to mitigate the catastrophic losses resulting from foreclosure.

5.      Defendant THE BANK OF NEW YORK MELLON, fka The Bank of New York ("BONY"), is a national association, acting as Trustee for the Certificateholders of CWMBS, Inc., CHL Mortgage Pass-Through 2007-10. According to BONY, the named securitized trust of "CWMBS, Inc., CHL Mortgage Pass-Through 2007-10" purports to be the owner of Plaintiff's mortgage loan. ("the Loan") secured by Plaintiff's homestead.

**B A R R A Z A   L A W   P L L C**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

6.      Defendant NORTHWEST TRUSTEE SERVICES, INC., is a Washington corporation, which serves as a trustee on behalf of defendant BANA and RCS as well as other loan servicers and lenders in eight western states. NWTS had conducted and continues to conduct tens of thousands of residential nonjudicial foreclosures in Washington alone. Although NWTS invoices and receives payments from creditors and loan servicers for services rendered in nonjudicial foreclosures, the fees for services by NWTS are paid by the loan servicers who then then add them to the mortgage loan accounts. Therefore, NWTS' fees are added to the total amount due and owing by the borrower of each loan in the event she cures or receives a modification.

7.      All the named defendants are participating in some or all aspects of buying, selling, servicing and foreclosure of mortgage loans secured by Washingtonians' primary residences. All have conducted business within the borders of the State of Washington whereupon their business practices of buying, selling, servicing and foreclosure have affected Plaintiff and other borrowers in substantially the same adverse manner.

8.      At all times relevant to this action, the defendants, and each of them, were the principals, employers, associates, co-venturers, agents and/or employees of one another and were acting within the purpose and scope of their agency and employment with the authorization and/or permission of their principal and /or employer. Each defendant has ratified and approved the acts of his agents, and at all material times, each of the defendants was responsible in some manner for the acts, conduct, or omissions alleged in this Complaint. Due to defendants' collective conduct directed toward the Plaintiff and her homestead, Plaintiff has suffered damages in excess of $75,000.00.

9.      The Court has personal jurisdiction over the defendants and subject matter

[**SECOND** AMENDED] COMPLAINT                    3

1    jurisdiction based on complete diversity as well as federal questions.

2        10.    Venue is proper in the Western District of Washington.

3                                    **FACTS**

4        11.    Plaintiff purchased her homestead for $487,000 in October of 2005. Less than

5    two years later, Plaintiff refinanced the loan and borrowed money from Northwest Mortgage

6    Alliance, LLC. The appraisal was done on behalf of the lender by the notorious LandSafe

7    Appraisal Services, a subsidiary of defendant BANA. LandSafe set valuation of Plaintiff's

8    property at $900,000.00 to give her $630,000 in refinancing. Former employees of LandSafe

9    revealed in a *qui tam* action, <u>U.S. v. Bank of America</u>, N.A., 1:11-cv-04207-PGG, U.S. District

10   Court, Southern District of New York, that BANA deliberately used "improper appraisal

11   practices that overstated the value of the homes backing BANA's portfolio of non-performing

12   loans by $6.6 billion." <u>http://dealbook.nytimes.com/2014/12/18/another-whistle-blower-in-</u>

13   <u>bank-of-america-case-set-to-collect-millions/?_r=0.</u>  Based the valuation rendered by LandSafe,

14   Plaintiff's mortgage Loan is within this group of highly inflated loans described in the *qui tam*

15   action.  Though she did not know at the time, Plaintiff, like many other borrowers, started her

16   mortgage Loan owing much more than what the property was worth in 2007. This phenomenon

17   was the primary cause of our housing market crash and our recent economic recession.

18       12.    The Loan obtained by Plaintiff is a Jumbo interest-only loan where the principal

19   balance is unaffected by any payments made by Plaintiff during the first ten years. At the

20   origination of the Loan, and for many years that followed, no one associated with the Loan

21   informed Plaintiff that the Loan would be, or had already been committed to a securitized pool

22   of subprime loans. This includes defendant BONY, who claims to be the trustee of the

23   certificate holders of the named securitized pool of loans.

24

[**SECOND** AMENDED] COMPLAINT                        4

13.     Immediately after origination in 2005, the notorious Countrywide acted as the servicer of Loan. In January of 2008, BANA acquired Countrywide and was servicing the Loan in the name of its subsidiary, BAC Home Loans. Plaintiff was led by BANA to believe that BANA was the "go to" company regarding all aspects of the Loan, and there was no one else involved in the Loan. Therefore, in December of 2009, while still being current on her mortgage payments, Plaintiff contacted BANA's customer service phone number 800-900-9000 to inquire about a possible loan modification in order to reduce her monthly payments or to convert the Loan into one that would be fully amortized.  Plaintiff spoke to Hadesia Richardson who checked and informed Plaintiff that with her good credit and payment history, she would easily be qualified for several loan workout programs. Richardson directed Plaintiff to BANA's website to learn more about the loan modification and forbearance under HOPE and HAMP and to obtain the HAMP application paperwork.

14.     Pursuant to BANA's expressed encouragement, in late December 2009, Plaintiff sent in her first request for loan modification under HAMP, accompanied by extensive financial information including tax returns and bank statements. Plaintiff was required to submit a hardship letter upon which she explained that she was experiencing financial difficulty due to her father's illness and the downturn of the economy. She called what BANA represented to be its HOPE Team at 877-744-7691 to verify that they had received her application package and spoke to Kimberly Christopher. Ms. Christopher told Plaintiff she was qualified and explained to Plaintiff that she should stop her previously arranged auto-draft payments. The reason, according to Ms. Christopher, was because under HAMP, Plaintiff's new payment would be $2643.51, a substantial reduction from her previous payment of $3,831.17.  Ms. Christopher emphasized that unless Plaintiff missed three payments, she would not be considered for a loan

[**SECOND** AMENDED] COMPLAINT                    5

modification.

15.     In January of 2010, plaintiff made her payment for $3,831.17 over the phone. When Plaintiff called BANA to follow up on the loan modification process, she was told that she had a "$7,800.00 past due." Plaintiff was shocked by BANA's announcement as she hadn't missed a single payment at that time. She inquired and was instructed to call BANA's Home Retention Department, 800-669-0102, and talked to "Mike."  Mike told her to call back in a week to 10 days as it would take BANA a few days to show receipt of the payment made by Plaintiff. Plaintiff was also assured at this time that her modification was still under review.

16.     In February of 2010, Plaintiff again made her regular payment in the amount of $3,831.174 over the phone and received confirmation number 957-3785. Thereafter, Plaintiff discovered BANA had reported one late payment to credit reporting agency so she called to inquire. Plaintiff also wanted to learn of the status of her loan modification application. She spoke to a supervisor named Dan Nasrin about the accounting error and he assured her that it would normally take a while for the payments received to be posted. Nasrin also assured Plaintiff he would speak with Kimberly Christopher and report back to Plaintiff; he never did.

17.     Thereafter, Plaintiff began to receive letters from BANA indicating that her payments were past due or not received by the bank. Plaintiff called on February 11, 2010 and spoke to Ashley Ipaq who told her that she will research into the why the payments were not registered in BANA's system as received, as well as the negative credit reporting. During this conversation, Ipaq reiterated to Plaintiff that normally, a borrower has to be 90-days past due for BANA to qualify for loan modification.

18.     In the days that followed, Plaintiff continued to contact BANA which, through its agents, made various misrepresentations to Plaintiff about the status of the payments she

B A R R A Z A   L A W   P L L C
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

made, and the application for loan modification she submitted.  BANA informed Plaintiff that a trial payment plan offer was on the way, and if Plaintiff signed and sent back the acceptance, she will also be eligible for a permanent HAMP modification.

19.    By March of 2010, instead of the modification paperwork as promised by BANA, Plaintiff received a "Notice of Intent to Accelerate" from BANA. She immediately contacted BANA and her call was passed around to BANA's "Making Home Affordable," "Default Prevention," and "Home Retentions" departments whereupon she was told that her application for modification was still under review, and that they had "escalated" her inquiry about January and February payments. Based on the fact that BANA did not acknowledge and credit Plaintiff's payments for January and February, and BANA's repeated message to her on how Plaintiff must miss three payments in order to be considered for loan modification, Plaintiff was finally persuaded that in order to obtain a loan modification, she must cease making her mortgage payments.

20.    Beginning in April of 2010, Plaintiff stopped making her $3,831.17 monthly payments being completely convinced that it was the only way that she could obtain the reduction of $1,187.66 in her monthly mortgage payment. Unbeknownst to Plaintiff, thousands of other borrowers have been induced in the exact same way to withhold their payments to BANA for 90 days, only to learn that BANA then used the missed payments to declare their loans to be in default and to initiate foreclosure upon their homes.

21.    Between May of 2010 and August of 2013, BANA continued to instruct Plaintiff to supplement her application for loan modification with additional financial information and documents. BANA claimed to have not received Plaintiff's paperwork and gave various fictitious or otherwise ridiculous reasons. Of the 20 separate occasions that Plaintiff was

**B A R R A Z A   L A W   P L L C**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

1   sending her application materials, BANA claimed it did not receive any document from her.

2   BANA also claimed that it had received a FedEx envelope from Plaintiff with nothing inside of

3   it.  Plaintiff has been extremely thorough about the number of timely submissions she had made

4   to BANA. Yet, she has never once been informed by BANA of receipt of a complete

5   application package.

6       22.    During this period of time, Plaintiff received information from BANA that kept

7   Plaintiff's hope for a loan modification alive. After all, her case was "escalated" to several

8   supervisors within BANA. Once she was able to speak with a David Hranic, a compliance

9   manager who was assigned to handle her case. He told her that her documents were "still in the

10   Imaging Department" and had not been back yet. Another time, Plaintiff received a recorded

11   message "There has been a change in the status of your loan, please call Bank of America Home

12   Loans at 1-800-669-0102."  Yet, when Plaintiff called, no one at BANA knew anything about

13   the message that was left on her phone. Once, Plaintiff was able to speak with Tina Belamy, a

14   supervisor in New York who told her that her application was denied because the property was

15   not owner-occupied. In response, Plaintiff repeatedly sent proof to BANA that she does in fact

16   live at the property.

17       23.    Plaintiff had the distinct impression that even though she called the main

18   customer service number to get assistance from BANA for home retention, she was in fact re-

19   directed to BANA's collection department where all personal and financial information she

20   provided were being used for debt collection and credit reporting purposes and not for loan

21   modification. She had the impression that BANA was either experiencing a tremendous staff

22   turnover or that the bank was using some other company or vendor in its dealings with her.

23   There was no coherency or continuity about BANA's servicing of Plaintiff's account.  Plaintiff

24

**B A R R A Z A   L A W   P L L C**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

1   always received BANA's correspondence many days later than the date specified in the

2   document. She also received letters dated the same day or within a couple of days of each other

3   that contradicted themselves. Above all, what BANA's employees told Plaintiff over the phone

4   was different from what was being represented by BANA in writing.

5       24.     On August 19, 2013, Plaintiff sent a Qualified Written Request to BANA via

6   certified mail. BANA acknowledged receipt of the QWR on August 22, 2013. Five days later,

7   BANA announced that servicing of the Loan had been transferred to defendant RCS. All of the

8   calls that Plaintiff made to BANA after that point were met with "You need to contact RCS. We

9   no longer service your loan."

10      25.     Plaintiff later learned that the treatment BANA gave her was part of BANA's

11  nationwide conspiracy to deny loan modification to homeowners. She learned that BANA's

12  former employees gave sworn testimony about how BANA systematically undermined the

13  HAMP program by routinely denying loan modifications to qualified applicants, withholding

14  reviews of completed applications and paying bonuses based on the number of new foreclosures

15  they initiated.  The employees' disclosure resulted in BANA's settlement with the federal

16  government and 49 states and referred to by BANA as the "DOJ Settlement."

17  https://homeloanhelp.bankofamerica.com/en/doj-settlement.html.

18      26.     Once servicing was transferred to RCS, RCS began to send Plaintiff numerous

19  correspondences beginning in September of 2013. These include "Notice of Default and Intent

20  to Accelerate," as well as forms to fill out to be qualified for "Home Affordable Modification

21  Program." Plaintiff contacted RCS by phone on October 17, 2013, and spoke with Promise

22  Roland who told her she would have to "start the loan modification process all over again"

23  because BANA "did not transfer" the loan modification material Plaintiff submitted over the

24

[**SECOND** AMENDED] COMPLAINT                    9

course of the past years. Plaintiff again complied by filling out forms, assembling personal and financial documents and mailing them overnight to RCS.

27.     At the same time that RCS purportedly reviewing Plaintiff's application for loan modification, it was sending her monthly mortgage statements representing sizable arrearages on the Loan. Plaintiff noticed that RCS was charging property inspection fees to the account on a monthly basis. The Subject Property is in a gated community and Plaintiff has maintained surveillance cameras on her home. Neither of these monitoring systems captured any actual inspection as claimed by RCS.

28.     While Plaintiff was supposedly under consideration for a HAMP modification by RCS, the company engaged in aggressive debt collection practices. RCS contacted Plaintiff's 80 year-old mother as well as Plaintiff's sister in-law on the pretext that it needed to locate Plaintiff. RCS telephoned Plaintiff at odd hours and several times on Sunday. RCS also issued "Pre-Foreclosure Notice" while talking to Plaintiff about a possible loan workout.

29.     In December 2013, RCS sent Plaintiff a notice informing Plaintiff that they will force-place flood insurance in the amount of $1682.75 on the property. Plaintiff strenuously objected to RCS' action and sent forth proof of insurance that she had on the home, FEMA maps and reports, Tax Parcel Maps and other records showing that the house is not in a flood zone. In January of 2014, RCS sent Plaintiff a letter which states: "We apologize for any inconvenience that [flood insurance imposition] have caused. Be assured that RCS has NOT made any flood disbursement for this property."  Despite this written apology, the following month, RCS charged $1682.75 against the Loan for flood insurance and sent Plaintiff a letter announcing to her: "Enclosed is a flood insurance policy we have purchased in accordance with your mortgage documents." Although Plaintiff repeatedly called and wrote to protest RCS'

**B A R R A Z A   L A W   P L L C**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

1    action, RCS failed to reverse charges relating to flood insurance from the Loan.

2       30.    In February of 2014, Plaintiff learned that RCS had assessed $105.00 for a BPO

3    or "Broker Price Opinion." She repeatedly inquired and requested a copy of the BPO but RCS

4    told her it could not provide her with one.

5       31.    On March 3, 2014, Plaintiff called RCS and spoke with "Rino," employee

6    number 10350. Rino said that RCS did not receive any documents from Plaintiff via fax in

7    relation to her application for loan modification. At that time, Plaintiff had recorded that she

8    faxed and mailed RCS, relating to her loan modification, well over 100 pages of documents.

9       32.    On March 7, 2014, Plaintiff received a letter from RCS indicating that "your loan

10   was referred to local counsel to begin foreclosure action." Extremely worried about losing the

11   house to foreclosure, Plaintiff immediately called and spoke to Triselda, employee number

12   10671. Triselda refused to provide the name of the attorney foreclosure had been referred to

13   over the phone. She told Plaintiff that she would have to get that information by making a

14   written request.

15      33.    Plaintiff in fact followed up by writing to RCS about the status of her HAMP

16   modification and contact information of the foreclosure attorney. She then called and spoke

17   with Patrick Rowles at RCS. He refused to provide any information to Plaintiff. He indicated

18   that RCS had "no record of any document" whatsoever sent by Plaintiff. When Plaintiff

19   expressed dissatisfaction and promised to contest RCS's actions, Mr. Rowles, referring to RCS's

20   claim that nothing was received from Plaintiff, told her in a detesting manner, "You can contest

21   that too!"

22      34.    On March 24, 2014, Plaintiff sent RCS a certified letter requesting an in-person

23   meeting to discuss her dire need to avert foreclosure.  RCS acknowledged Plaintiff's letter in

24

[**SECOND** AMENDED] COMPLAINT                          11

**B A R R A Z A   L A W   P L L C**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

1    three separate writings dated in April of 2013, all asking, "please allow 30 business days for us

2    to complete our research and respond to your request." RCS had never provided Plaintiff with a

3    face-to-face meeting as required under Washington Foreclosure Fairness Act.

4        35.    Plaintiff received a letter from the law firm of McCarthy Holthus, as the attorney

5    for RCS. Instead of a face-to-face meeting as Plaintiff requested, McCarthy Holthus was only

6    willing to give Plaintiff a "telephonic meeting," whereupon the law firm would act as the

7    facilitator. Plaintiff had no faith in a telephonic meeting giving the experience she has with

8    BANA and RCS over the past years and insisted upon a face-to-face meeting with the real

9    stakeholder of her Loan. In its communication to Plaintiff, McCarthy Holthus requested that

10   Plaintiff submit yet another full application for loan modification, even though she had mailed

11   and faxed the application package and supplements in the previous 20 separate occasions.

12       36.    On April 18, 2014, RCS' agent, defendant NWTS, nailed a Notice of Default on

13   Plaintiff's back wall. Although Plaintiff's neighbors saw this Notice of Default, Plaintiff herself

14   did not find out until days later. Plaintiff was mortified by the incident and immediately wrote

15   to RCS to contest the information contained within the Notice of Default.  She sent a copy of

16   her letter via certified mail to defendant NWTS, defendant BANA, defendant BONY, and RCS

17   at both of its Error Resolution Center and Customer Relations Department on April 25, 2014.

18       37.    Upon information and belief, BANA was the entity that referred the Loan to

19   NWTS for nonjudicial foreclosure.  In order to foreclose, NWTS provided BANA prepared

20   forms to sign, including Beneficiary Declaration and Loss Mitigation Declaration. NWTS,

21   however, stated in the Notice of Trustee's Sale that the "obligation" was secured in favor of

22   Mortgage Electronic Registration Systems, Inc., as Beneficiary, and that the beneficial interest

23   of the Deed of Trust had been assigned to defendant BONY.

24

[**SECOND** AMENDED] COMPLAINT                    12

**B A R R A Z A   L A W   P L L C**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

38.     Plaintiff made a total of five separate requests in writing, and sent them all via certified mail, to have a face-to-face meeting with RCS so that she can begin to discuss options to save her home in earnest. RCS did not acknowledge, much less comply with said requests. Out of all the entities that Plaintiff mailed her request for a face-to-face meeting, only NWTS responded. However, NWTS simply referred her back to McCarthy Holthus to obtain the "telephonic meeting." Regarding Plaintiff's request to ascertain who has ownership of the Loan, NWTS responded that "it would not be practical, advisable or reasonable to deliver … or prove ownership of the original note."

39.     Plaintiff understands that either BANA or RCS would have to provide NWTS with a Loss Mitigation Declaration certifying that Plaintiff did NOT request a meeting with RCS, which would be completely untrue because she did.  Upon information and belief, NWTS does not conduct any investigation into the information given to it by the loan servicers or lenders in connection with nonjudicial foreclosures, especially regarding loss mitigation efforts by homeowners. Moreover, NWTS does not make any decision independent of the loan servicers or lenders; it simply follows directives issued by these clients. NWTS' summary dismissal of Plaintiff's request for information stood in stark contrast with how aggressively and thoroughly NWTS conducted the nonjudicial foreclosure. On the onset of the nonjudicial foreclosure, NWTS issued 70 separate notices to Plaintiff. In total, NWTS issued to Plaintiff well over a hundred of notices concerning the foreclosure of her home.

40.     Upon information and belief, throughout the nonjudicial foreclosure process of Plaintiff's homestead, NWTS had no actual proof that BANA or RCS was the actual noteholder. Similarly, throughout the nonjudicial foreclosure of Plaintiff's homestead, NWS had no actual proof that the "owner" of the Loan is the certificate holders, the securitized trust or the trustee of

**B A R R A Z A   L A W   P L L C**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

1    the securitized trust, defendant BONY.

2         41.    Plaintiff was never given an opportunity to meet face-to-face with RCS or the

3    real stakeholder of her Loan despite five separate requests. Plaintiff genuinely believed that if

4    she could communicate with the person or entity that has a vested interest in turning the Loan in

5    to a performing loan and saving the collateral instead of selling it, that person or entity would

6    want to work with her to modify the Loan. At all times relevant to the controversy, Plaintiff was

7    willing and able to make modified payments on the Loan.

8         42.    When RCS took over the Loan, it began to mail Plaintiff monthly notifications of

9    various charges, the most substantial amounts being "attorney fees." In March of 2015, Plaintiff

10   issued to RCS a RESPA Written Request specific to the charges which were assessed to the

11   Loan, including invoices or payments that RCS actually made to the attorneys or vendors. RCS

12   acknowledged receipt of her Request in several letters, but never provided the information

13   asked for by Plaintiff.

14        43.    In September of 2015, Plaintiff again issued another RESPA Written Request to

15   RCS concerning the same subject matters. Plaintiff received a letter from RCS dated October 1,

16   2015, indicating that it was still "researching the information" and asked for a 30-day extension

17   to respond. In November of 2015, Plaintiff finally received a letter dated October 26, 2015,

18   from RCS whereupon it stated: "In reference to your request for invoices and documents for the

19   fees that were assessed to your loan, RCS is under no obligation to provide you with proof or

20   documents. Please be advised that the fees were assessed to your account in conjunction with

21   the terms outlined in the Deed of Trust that you signed at origination." In reviewing the Deed

22   of Trust, Plaintiff continued to be puzzled by RCS' claim that it could charge attorney's fees to

23   the Loan on a monthly basis.

24

[**SECOND** AMENDED] COMPLAINT                    14

44.     Unable to overcome BANA and RCS's refusal to consider her application for a loan modification for several years, Plaintiff gave up hope of a loan modification and prepared herself to sell the property and contain her losses. In 2015, Plaintiff began to request approval from RCS to short sell her home. RCS' processing of Plaintiff's short sale application, just like the loan modification application, took many, many months during which time RCS continued to hound Plaintiff with debt collection calls and notices. Just like in the loan modification process, RCS repeatedly accused Plaintiff of failing to submit complete or current financial information when she in fact did so.

45.     RCS engaged in a practice that sabotaged Plaintiff's loss mitigation effort which is to send out requests for documentation or supplemental to the application and setting deadlines for compliance well before the request got to Plaintiff. In one particular instance, Plaintiff received a letter from RCS dated April 14, 2015, requesting update of her documentation for the short sale by April 15, 2015. While it is unknown when RCS actually mailed it, the letter was not received by Plaintiff until a week later on April 22, 2015, rendering it impossible for Plaintiff to meet the April 15, 2015 deadline set by RCS.

46.     Defendant Renee M. Parker represented to Plaintiff that she was the attorney for RCS. Parker communicated with Plaintiff and directed her to take certain actions in relation to Plaintiff's short sale request. In September of 2015, Parker issued a letter informing Plaintiff that "Due to the passage of a significant period of time since your last submission, this process will need to start from the beginning." Parker sent Plaintiff a new application to complete and directed Plaintiff to contact her directly to arrange for an interior appraisal, rather than for Plaintiff to talk to RCS directly as the servicer.

47.     RCS and Parker demanded that Plaintiff provide access for an interior appraisal

**B A R R A Z A   L A W   P L L C**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

1  of the property. Yet, RCS' agent kept cancelling and re-scheduling the appraisal causing

2  Plaintiff to endure inconvenience and severe disruption to her life and her work in complying

3  with the request. Nevertheless, Parker accused Plaintiff of failing to comply with RCS' request

4  for the appraisal and further accused Plaintiff of withdrawing or canceling her short sale

5  application from RCS which was completely untrue. Plaintiff also saw that the cost of the

6  appraisal was charged to her Loan account. Plaintiff received letters from both Parker and RCS

7  denying her short sale request on the ground that she had asked for the withdrawal in writing.

8  Yet, when Plaintiff repeatedly asked to see such letter that she supposedly had written, neither

9  Parker nor RCS would or could produce it.

10      48.    Upon information and belief, Parker engaged in the "billable hours" practice as a

11  lawyer and began to bill her client, RCS, for minute-increments of time she spent regarding

12  Plaintiff's short sale application. It is further belief that Renee received payments and personally

13  profited from this "billable" practice. Defendant RCS in turn charged these "Attorney Fees" that

14  it incurred to the Loan and sent Plaintiff written notification that it had done so.

15      49.    Upon information and belief, Parker has engaged in the practice of billing loan

16  servicers for services unrelated to the enforcement of the loan documents, at least in one other

17  case in the Western District of Washington. The practice of the loan servicer's passing its

18  attorney's fees incurred in matters unrelated to the enforcement of the deed of trust has been

19  determined by Judge Robert S. Lasnik, in <u>Lucero v. Cenlar</u>, case number 2:13-cv-00602-RSL,

20  in the U.S. District Court, Western District of Washington as being unlawful and a breach of the

21  deed of trust.

22      50.    Upon information and belief, the tasks performed by Parker relating to the Loan

23  were not legal services but loan servicing functions. As such, Parker's billing, and RCS'

24

**B A R R A Z A   L A W   P L L C**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

1    charging attorney's fees against the Loan account were improper. Moreover, the attorney fees

2    charged by RCS as a condition for Plaintiff's exercise of a loss mitigation option are not

3    permissible under laws.

4           51.     Because of the pressure and intimidation that Parker exerted upon Plaintiff as an

5    unrepresented person, Plaintiff had to hire Intrepid Law Group to assist in her short sale effort.

6    The involvement of Intrepid Law Group did not improve either the time it took to process or the

7    quality of RCS' processing of Plaintiff's application for short sale. After stringing Plaintiff

8    along for many more months, defendant Parker and RCS falsely certified that Plaintiff had

9    withdrawn her short sale application.

10          52.     In 2015, the Consumer Financial Protection Bureau commenced an

11   administrative action against RCS and fined the company $1.5 million for illegal mortgage

12   servicing practices which include "making misrepresentations to consumers regarding their

13   payment obligation and the status of their loans." This is exactly what RCS did to Plaintiff.

14   http://files.consumerfinance.gov/f/201507_cfpb_consent-order_residential-credit-solutions.pdf.

15   (visited September 12, 2016).  On RCS' website, consumers are currently informed that RCS

16   "is no longer actively servicing loans." https://residentialcredit.com/ (visited September 12,

17   2016).

18          53.     Presumably because of the federal regulator's crackdown, RCS is no longer

19   servicing residential loans and in February of 2016, Plaintiff was informed that the Loan was

20   transferred back to BANA. Immediately upon the transfer, BANA started to send Plaintiff

21   monthly mortgage statements and debt collection notices representing arrearages in excess of

22   $300,000.  Upon information and belief, the arrearages include all the fees and costs relating to

23   default and foreclosure caused by BANA and RCS's systemic and intentional delay in

24

[SECOND AMENDED] COMPLAINT                    17

1  processing of Plaintiff's multiple applications for loss mitigation, beginning in 2010 and

2  continuing to the present.

3      54.   BANA' treatment of Plaintiff's application for loan modification fit BANA's

4  pattern or practice described in the case of U.S v. Bank of America, United States District Court

5  for the Eastern District of New York, case number 1:11-cv-03270-SLT-RLM (Pacer, Dkt. 1)

6  exactly. There, an independent contractor who worked with BANA described how BANA drove

7  borrowers into default and foreclosure through a variety of mechanisms, including: (a)

8  developing and maintaining a fraudulently concealed document image repository of homeowner

9  HAMP documentation so that BANA or its agents could falsely deny receiving homeowner

10  documents or claim incompleteness even after satisfactory receipt of them; (b) deliberately

11  deceiving homeowners who complain about BANA handling of their HAMP inquiries and

12  submissions, with efforts to keep them from HAMP eligibility; (c) intentionally forcing

13  homeowners to wait months before a response to HAMP  and (d) unlawfully proceeding with

14  foreclosure actions while homeowners are reviewed for HAMP eligibility or during a payment

15  period.

16      55.   On August 14, 2014, the U.S. Department of Justice, six states and BANA

17  reached an agreement to settle claims that BANA, Countrywide, Merrill Lynch and First

18  Franklin violated federal and state laws in connection with the packaging, origination,

19  marketing, sale, structuring, arrangement and issuance of residential mortgage-backed securities

20  and collateralized debt obligations. As part of the settlement agreement, BANA is to provide

21  consumer relief among which, first lien principal forgiveness and payment forbearance in the

22  amount of $7 billion. http://bankofamerica.mortgagesettlementmonitor.com/about-the-

23  settlement/.  On BANA's own website, the bank declares: "Under the agreement, we are

24

[SECOND AMENDED] COMPLAINT                    18

1   implementing new foreclosure prevention programs to qualified customers . . . We anticipate

2   that we will be ready to offer these programs in the fourth quarter of 2014 . . . The sooner we

3   understand your situation, the sooner we can explore all of the options that may be available to

4   you." https://homeloanhelp.bankofamerica.com/en/doj-settlement.html, visited September 12,

5   2016. Despite this public announcement, BANA has yet to allow Plaintiff to benefit from its

6   "new foreclosure prevention programs" being implemented as a result of the DOJ's settlement.

7           56.     Most recently, the Tenth Circuit court of appeals reversed the dismissal of claims

8   that BANA and one of its vendors, Urban Settlement Services, d/b/a Urban Lending Solutions,

9   conspired to wrongfully deny HAMP modifications to qualified homeowners. George v. Urban

10  Settlement Serv. et al., U.S. Court of Appeals, Tenth Circuit, No. 14-1427, decided August 15,

11  2016. The court of appeals reinstated allegations contained within George's Amended

12  Complaint, among them, that BANA "serially strung out, delayed, and otherwise hindered the

13  modification processes that it agreed to facilitate."  George alleges that BANA and Urban

14  "worked in concert, under BOA's direction and for many years, to frustrate the HAMP process

15  and to prevent as many homeowners as possible from obtaining permanent loan modifications

16  that complied with HAMP while allowing BOA to maintain the appearance to regulators and

17  the public of trying to comply with its HAMP obligations."  The complaint pointed out that

18  "Consumers were led to believe that they were dealing with BOA when actually, and

19  unbeknownst to them, they were communicating with Urban-who was posing as BOA's "Office

20  of the President."  Specifically, George alleges that "[a]s part of the loan-modification scheme

21  and enterprise, Urban became a 'black hole' for documents sent by homeowners." George v.

22  Urban Settlement, et al., 1:13-cv-01819-PAB-KLM (Pacer, Docket 12, pp.  4-6 of 96). Again,

23  BANA's continuing treatment of the Plaintiff fits the racketeering activity described in George

24

[SECOND AMENDED] COMPLAINT                          19

1    to the last detail.

2        57.    On June 1, 2016, Plaintiff issued Notice of Error under Regulation X, RESPA,

3 disputing the necessity to have flood insurance imposed on her homestead because her property

4 has never been determined to be in the flood zone according to FEMA Flood Determination

5 Map. BANA responded in a letter dated July 20, 2016, expressing that "no corrections are

6 required" despite the fact that RCS had previously apologized and deemed the imposition of

7 flood insurance to be in error. BANA further provided, as authority for requiring Plaintiff to

8 maintain flood insurance on her home, information issued by the National Flood Insurance

9 Program (NFIP). However, NFIP is actually guided by FEMA's flood hazard mapping which

10 Plaintiff provided to BANA and its predecessor, RCS, repeatedly, to prove that Plaintiff's

11 home is not located within a Special Flood Hazard Area. BANA's response indicates that

12 BANA did not conduct any investigation into Plaintiff's Notice of Error but simply provided her

13 with a canned response.

14        58.    In October of 2015, defendant Bank of New York Mellon ("BONY") sued

15 Plaintiff in the superior court of Washington for declaratory and equitable relief. Even though in

16 the prior nonjudicial foreclosure, defendants BANA, RCS and NWTS had affirmatively and

17 repeatedly relied upon the legal description contained within the Deed of Trust, BONY now

18 seeks to divest from Plaintiff, ownership of a separate parcel of land that Plaintiff had acquired

19 through litigation her neighbor and her neighbor's lender initiated against Plaintiff. Plaintiff

20 resisted the litigation and counterclaimed for adverse possession. Her hard work and expenses

21 resulted in the court's granting her the separate parcel of land, which has its own legal

22 description, tax number, and street address, herein referred as the "Third Parcel." None of the

23 defendants had ever paid for any of the costs, or expended any effort or resources in the

24

**B A R R A Z A  L A W  P L L C**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

1   litigation, or the property taxes relating to the Third Parcel.

2       59.     Throughout Plaintiff's effort to obtain a loan modification or to short sell her

3   home, she had informed BANA and RCS repeatedly that chain of title has been affected by her

4   acquisition of the Third Parcel and that her effort in securing the same needs to be taken into

5   account. Plaintiff's plea fell on deaf ears just like all other pleas she has made to these

6   defendants. Yet, in suing Plaintiff for ownership of the Third Parcel, BONY accuses Plaintiff of

7   being deceptive and concealment of these facts that are clearly verifiable by way of public

8   records as well as by the servicing/loan modification records of BANA and RCS.

9       60.     Plaintiff's homestead has been appraised by RCS in the last year and the value

10  determined by RCS was just around $300,000. This valuation was based upon what the original

11  lender, Northwest Mortgage Alliance, LLC, determined to be the boundary of the property as

12  collateral for the Loan and does not include the Third Parcel. This valuation also more closely

13  reflects the property's worth, under current market conditions.  BANA and RCS knew that they

14  can make more money servicing the mortgage debt as a default debt, and they make more

15  money foreclosing on Plaintiff's home, than to provide her with a modification. BANA and

16  RCS' deliberate delay of the modification and short sale processes caused the arrears in the

17  Loan account to grow to $1 million at the present when the actual value of the property is a

18  mere $300,000.

19      61.     In the Western District of Washington, BANA's *modus operandi* has been well

20  documented in a dozen cases. Some of these are Gates v. Bank of America, 13-00834JCC

21  (plaintiff alleged entry into a trial modification but was denied a permanent loan modification);

22  Steadman v. Green Tree, 14-00965JLR (same); Richmond v. Green Tree, 14-01159RAJ (same);

23  Thomas v. Flagstar (same), 15-01309RSL; Raney v. Green Tree,  14-01937TSZ (same);

24

**B A R R A Z A   L A W   P L L C**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

1  Micklas v. Green Tree, 16-00315RSL (same); Diaz v. Green Tree, 15-00359RSL; King v. Bank

2  of America,  15-01014 TSZ (same); Free v. Deutsche Bank, 15-05139RBL (prolonged

3  processing of loan modification causing harm).

4       62.     Upon information and belief, BONY has not specifically recognized BANA,

5  RCS or NWTS as its official agents, representatives or assignors. Yet it appears that BONY has

6  conferred broad discretion and authorization upon its agents and representatives, defendants

7  BANA, RCS, Parker and NWTS to service the Loan, to process loss mitigation requests, and to

8  foreclose on the property nonjudicially. BONY did not supervise, monitor or otherwise made

9  itself aware of the actions taken by the agents.  As such, if BONY is really the party with a

10  direct stake in the Loan and the property, BONY must be bound by all actions taken by the co-

11  defendants BANA, RCS, Parker, and NWTS and be liable for their actions as well as their

12  omissions.

13       63.     The defendants' conduct, individually and collectively, have caused Plaintiff

14  severe emotional distress including feelings of intimidation, nervousness, anger, frustration,

15  fear, shame, sadness, despair, helplessness and rage. These feelings have been caused by

16  BANA's inducement for Plaintiff to cease payments on the Loan only to declare her Loan to be

17  in default. These feelings have been caused by BANA and RCS' repeated invitation for Plaintiff

18  to submit applications for loss mitigation and once they gained the most private details about

19  her financial and personal life, they used such information not to assist her in saving her home,

20  but to enforce debt collection and foreclosure. These feelings have been caused by the

21  oppressive treatment that Plaintiff has received during her application for loss mitigation. These

22  feelings have also been caused by BONY's outrageous attempt to steal from Plaintiff the Third

23  Parcel that she acquired that is unrelated to the refinancing transaction.

24

[**SECOND** AMENDED] COMPLAINT                22

64.     Defendant BANA sent Plaintiff a booklet purportedly to help her transition out of her house and into alternative living arrangement during the same period of time that it told Plaintiff her application for loan modification was under review. In receipt of this booklet, Plaintiff sank to a new level of confusion and despair. Confusion for not knowing which is the truth, and despair because despite her devotion to the cause of the loss mitigation, Plaintiff never knew from one day to the next what would happen to her home and where she would end up.

65.     Plaintiff has been formally diagnosed with PTSD. She has experienced anxiety and panic attacks, depression and insomnia. For a period of time, Plaintiff had thoughts of suicide; she wanted to shoot herself in the head while being on the phone with the defendants' agents so they can understand the impact of their conduct on her life.

66.     In addition to the emotional distress, Plaintiff has suffered from a medical condition whereupon her abdominal muscles, intestines and surrounding nerves contracted, seized up into bundles and became "calcified." After six separate surgeries, this mysterious and painful medical condition continues to affect Plaintiff as these calcified bundles became three large tumors pressing against her organs and causing internal hemorrhaging . Plaintiff had to endure the terrifying experience of being tested for cancer and she underwent more proceedings to remove these tumors. As of the present, Plaintiff continues to receive treatment for this condition, which, appeared to have been caused by prolonged acute stress from being involved in the whole process of loss mitigation with the defendants.

67.     Plaintiff has paid thousands of dollars for assistance from other professionals in her ongoing struggle to save her home. Plaintiff has spent hundreds of hours putting together documentation required by the defendants and hundreds more hours being on the phone with the

**B A R R A Z A   L A W   P L L C**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

defendants' employees or agents on the customer service line in an effort to either obtain a loan modification to keep her home and pay on the debt or to sell her home and be free of the debt. These hundreds of hours are what Plaintiff could devote to her work and earning an income or to enjoy her life.  Plaintiff also is out-of-pocket hundreds of dollars for mileage, copy, fax, postage and overnight delivery costs of the documentation she has provided the defendants.

68.     Plaintiff lost time she spent preparing the various RESPA notices and mailing them to the defendants via certified mail. She has also incurred costs of photocopying, postage, and mileage relating to her effort to obtain information of the Loan using the means provided by RESPA.

69.     Plaintiff has suffered from adverse credit reporting by BANA and RCS that the Loan is in default and the property is in foreclosure. The negative reporting has been going on for years. Plaintiff could not borrow money or obtain an extension of credit even for a credit card. Plaintiff's home has been labeled by NWTS as being under foreclosure and the information has been picked up by other sites and broadcasted via the internet, and as such, the property suffers a diminution in value.

70.     Plaintiff has suffered injury caused by the defendants' conduct, including but not limited to, longer time to pay off the Loan, not receiving the benefit of a permanent HAMP modification, accrued interests, late fees, and fees and costs associated with default and foreclosure, improper negative reporting to credit bureaus resulting in damaged credit, monetary harm due to inappropriate fees and charges assessed to her Loan account including broker price opinion fees, property inspection fees, breach fee, foreclosure fees, and attorney's fees.

71.     Plaintiff has suffered injury at the hand of defendant BONY as the action filed by BONY has clouded her title of the property, as well as title of the Third Parcel she acquired

[SECOND AMENDED] COMPLAINT                    24

separately. BONY is also liable to Plaintiff for all actions taken by BANA, RCS, Parker and NWTS and for all omissions by them based on agency.

## CAUSES OF ACTION

72.     Plaintiff expressly incorporates and incorporates by reference, all of the foregoing factual allegations as enumerated in under the Facts Section, into each and every one of her Causes of Action below:

## COUNT ONE: BREACH OF DEED OF TRUST *BY BANA*

73.     *Prior to inducing Plaintiff to stop making payments in order to be eligible for a loan modification,* BANA ~~and RCS~~ breached the terms of the Deed of Trust by failing to account for all payments made by Plaintiff in the manner provided for under Uniform Covenants, paragraph 2, of the Deed of Trust. BANA ~~RCS as agents and BONY as principal, breached the DOT by imposing attorney's fees which were not incurred in the preservation of the collateral as prescribed in the loan document.~~ *breached the terms of the Deed of Trust by imposing fees and costs including attorney fees which were not permitted under the terms of the Deed of Trust.*

74.     BANA breached the terms of the DOT by declaring Plaintiff's Loan to be in default when she had not missed any payment.

## COUNT TWO: BREACH OF GOOD FAITH AND FAIR DEALING

75.     BANA ~~and RCS~~ violated the duty of good faith and fair dealing by inducing Plaintiff to cease payments on the Loan and to apply for loan modification under HAMP when they had no intention of ever considering, let alone approving Plaintiff for a HAMP modification.

76.     BANA ~~and RCS~~ violated the duty of good faith and fair dealing by failing to

**B A R R A Z A   L A W   P L L C**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

apply the payments Plaintiff made and declaring Plaintiff in default when she made all the payments at the time.

77.     BANA ~~and RCS~~ *modified an*d supplemented the Deed of Trust with verbal and written promises that Plaintiff would receive a loan modification under HAMP if she complied with conditions set forth by them. Although Plaintiff did everything she was asked, BANA ~~and RCS~~ retained the sole discretion and authority to approve or deny Plaintiff's application for loss mitigation.  In refusing to acknowledge receipt of Plaintiff's application and refusing to process her application in earnest, *BANA* ~~the defendants~~ violated the duty of good faith and fair dealing under the Deed of Trust.

## COUNT THREE : ~~BREACH OF THE DEED OF TRUST ACT~~ *NWTS IS LIABLE UNDER NEGLIGENCE*

78.     Plaintiff is a member of the class intended by the Deed of Trust Act ("DTA") to be protected from wrongful foreclosure. *The Act imposes a duty of good faith upon NWTS as the trustee which requires the trustee to remain impartial and protect the interests of all of the parties.* ~~Defendant NWTS' conduct toward Plaintiff actually increased the risk of a wrongful foreclosure~~. Specifically, NWTS violated the duty of good faith required by the DTA in several respects. First, NWTS was notified by Plaintiff that she requested a face-to-face meeting with the lender and was never granted one, but NWTS accepted a Loss Mitigation Declaration that indicated the contrary, and advanced nonjudicial foreclosure. Second, NWTS failed to conduct a cursory investigation which would have revealed that the Loan was under review for loss mitigation at the time NWTS issued the Notice of Default and set the sale date. Third, when requested by Plaintiff for NWTS to verify proof of ownership of the obligation secured, rather than verifying the information contained within the Beneficiary Declaration, NWTS refused, citing that "it would not be practical, advisable or reasonable to deliver … or prove ownership

**B A R R A Z A   L A W   P L L C**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

of the original note."  These are material failures by NWTS to act as an impartial trustee under the DTA. RCW 61.24.030(7)(a); 61.24.127(1)(c);  RCW 61.24.010(4).

79.  ~~Although Plaintiff is not seeking monetary damages for NWTS' violations of the DTA *per se*, she does plead these violations as the foundation of her claims under the Washington Consumer Protection Act~~. *In addition to its duty of good faith under the DTA, NWTS also owed Plaintiff a duty of care and it breached such duty by failing to verify the information forming the basis for all adverse actions it took against the Plaintiff. As a matter of practice, and in this individual case, NWTS would have conducted a title search upon the Property prior to initiating nonjudicial foreclosure via a Trustee Sale Guarantee or TSG. NWTS added the cost of this title search onto the amount to cure the default and said cost is then transferred onto the Plaintiff as the borrower of the Loan. NWTS negligently failed to recognize or account for the fact that the foreclosure that it initiated encumbered only the Subject Property as described by the Deed of Trust, which does not include the Third Parcel. Additionally, NWTS was negligent in its failure to communicate or confer with BANA, RCS or BONY at all for the purpose of determining  whether the foreclosure should be suspended or canceled due to the Loan undergoing modification or being considered for  a short sale. NWTS' negligence caused Plaintiff's property to be permanently identified as being under active foreclosure on its website and other real estate related websites including Zillow and Realtor Trac. NWTS' negligence caused the valuation of the Subject Property to be substantially reduced and its marketability severely impaired.*

**<u>COUNT FOUR: VIOLATIONS OF THE CONSUMER PROTECTION ACT</u>**

80.  The defendants BANA, RCS and NWTS violated the CPA as to each of the five elements: (1) an unfair or deceptive act or practice; (2) in trade or commerce; (3) an impact on

**B A R R A Z A   L A W   P L L C**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

the public interest; (4) an injury to each plaintiff in her business or property; and (5) causation.

81. First, the defendants' actions taken in connection with mortgage loan servicing, default servicing, offers and processing of loan modification, acceptance of modified payments, and conduct of nonjudicial foreclosure are without a doubt occurring in trade or commerce. The defendants' collective practice of inducing borrowers to enter into loan modifications, collecting payments but not applying them, and simultaneously foreclosing on their homes is both unfair and deceptive. The defendants' well established *modus operandi* has harmed Plaintiff and other consumers who are similarly situated, including those plaintiffs named in the above-referenced lawsuits in the Western District of Washington. The defendants' *modus operandi* also has actually harmed or has the potential of harming other unsuspecting consumers in the same exact manner that Plaintiff has been harmed. This is documented by the actions taken by the FTC and CFPB's against BANA and RCS.

82. The defendants' business practice collectively affects an important public interest as Congress has seen fit to enact the Wall Street Reform and Consumer Protection Act (Dodd-Frank Act) that imposes new requirements on loan servicers and gave the CFPB the authority to implement these new requirements as well as to adopt additional regulations for consumer protection. This is evidence that the defendants' conduct impacts a public interest.

83. In particular, the CFPB's Supervisory Highlights Mortgage Servicing Special Edition, Issue 11, June 2016, http://www.consumerfinance.gov/data-research/research-reports/supervisory-highlights-mortgage-servicing-special-edition-issue-11/, found "one or more servicers engaged in deceptive and abusive practices in connection with communicating whether and when outstanding fees, charges, and advances would be assessed." Id. at *10. The described practices there are the same as those engaged in by BANA and RCS.

**B A R R A Z A  L A W  P L L C**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

84.     The CFPB expressly found where "The servicer(s) also continued to report borrowers that had been delinquent at the beginning of their trial modifications as delinquent to the consumer reporting agencies during the length of the delays," such conduct is an unfair practice. Id. at *12.  BANA and RCS have continued to report the Loan as delinquent and the Plaintiff as being under foreclosure during the six *or more* years that it has taken them to deny her application for loss mitigation.

85.     *BANA violated the CPA by failing to apply the payments Plaintiff made and declaring Plaintiff in default when she in fact made all the payments which were due. BANA lied when it told Plaintiff to stop making payments on the Loan and to apply for loan modification under HAMP when BANA had no intention of ever considering Plaintiff's eligibility for a HAMP modification. BANA modified and supplemented the Deed of Trust with verbal and written assurances that Plaintiff would receive a loan modification under HAMP if she complied with conditions set forth by them; these assurances were false.  BANA and its agents worked in concert to frustrate the HAMP process and to prevent Plaintiff as well as other homeowners from obtaining permanent loan modifications while maintaining the appearance to regulators and the public that it is trying to comply with its HAMP obligations.*

86.     *Upon information and belief, BANA's unfair and deceptive business practices have not been limited to Plaintiff's loan, but also affect other borrowers who are similarly situated. BANA's unfair and deceptive business practices as described herein have the capacity of injuring other persons in the same manner that Plaintiff has been injured.*

87.     *RCS' violations of the CPA are numerous. RCS force-placed flood insurance upon the Property despite Plaintiff's repeated protest and production of proof that the Property has never been in the flood zone. RCS charged fees for multiple proper inspections and property*

**B A R R A Z A   L A W   P L L C**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

*preservation but Plaintiff suspected these services did not occur based on where her Property is located. RCS charged fees for Broker Price Opinion but refused to provide Plaintiff with proof that the service was in fact done and a written opinion had been rendered. RCS assessed attorney fees against the Loan on a monthly basis in substantial amounts but refused to provide explanations or itemization of the fees incurred as required by RESPA. RCS failed to address Plaintiff's complaint that the attorney hired by RCS, defendant Renee Parker, did not render legal services, but performing administrative functions relating to the processing of Plaintiff's application for loss mitigation. RCS and Renee Parker both misrepresented many aspects of Plaintiff's application including the assessment of attorney fees as a condition of her request to short sell the Property, and that Plaintiff was no longer interested in pursuing a short sale.*

88.   *RCS solicited Plaintiff to apply for HAMP repeatedly without the intention to process said application in good faith which is evidence by RCS' repeated claim that application material were not received, or when received, they were not complete. Through written correspondence, RCS set deadlines for Plaintiff to meet regarding her application processing but these deadlines had already passed, rendering it impossible for Plaintiff to comply. When Plaintiff requested to meet face-to-face with RCS to discuss loss mitigation options, RCS refused to grant her such meeting. During the period of time when RCS was purportedly processing Plaintiff's application for loss mitigation, the defendant engaged in an aggressive debt collection campaign by calling Plaintiff at odd hours and on weekend. RCS also telephoned Plaintiff's elderly mother and Plaintiff's sister-in-law using the pretext that it needed to locate Plaintiff when RCS knew all along that Plaintiff has remained at the Property the entire time.*

89.   *Upon information and belief, RCS's unfair and deceptive business practices have*

**B A R R A Z A   L A W   P L L C**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

1    *not been limited to Plaintiff's loan, but also affect other borrowers who are similarly situated.*

2    *RCS's unfair and deceptive business practices as described herein have the capacity of injuring*

3    *other persons in the same manner that Plaintiff has been injured.*

4        *90.    NWTS violated the CPA because it issued a notice of default before the*

5    *expiration of 90 days contrary to RCW 61.24.031 (1)(a) . NWTS violated the CPA when it*

6    *initiated foreclosure against the Subject Property because NWTS never had proof that RCS was*

7    *the actual note holder. In fact, when Plaintiff asked for such proof, NWTS responded to her that*

8    *"it would not be practical, advisable or reasonable to deliver . . . or prove ownership of the*

9    *original Note." By ignoring Plaintiff's request for verification of the authority underlying*

10    *NWTS' power of sale—which is required by law— and by forging ahead with foreclosure when*

11    *there was a clear absence of said authority and the lack of compliance with the law, NWTS'*

12    *foreclosure practices violated the CPA because they were (1) unfair and deceptive; (2)*

13    *occurring in trade or commerce; (3) impacting the important public interest of prevention of*

14    *wrongful foreclosure; (4) resulting in the diminution of Plaintiff's Property and its*

15    *marketability; and (5) NWTS directly caused for the Property to be identified and advertised*

16    *broadly as being under active foreclosure whereupon such status resulted in the diminution of*

17    *the Property's value and the impairment of the Property's marketability.*

18        *91.    Upon information and belief, NWTS's unfair and deceptive business practices*

19    *have not been limited to Plaintiff's loan, but also affect other borrowers who are similarly*

20    *situated. NWTS's unfair and deceptive business practices as described herein have the capacity*

21    *of injuring other persons in the same manner that Plaintiff has been injured.*

22        92.  ~~85.~~    Plaintiff has suffered substantial injury as a result of the defendants'

23    conduct. These damages include attorney's fees for assistance in the loss mitigation ~~in her short~~

24

**B A R R A Z A   L A W   P L L C**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

sale endeavors, time loss from having to put together documentation required by the defendants; time loss from being on the phone with the defendants' employees or agents in an effort to either obtain a loan modification or to sell her home and be free of the debt; costs of mileage, copy, fax, postage and overnight delivery of the documentation she has provided the defendants dozens of times; credit damage; longer time to pay off the Loan; not receiving the benefit of a permanent HAMP modification; accrued interests; late fees; and fees and costs associated with default and foreclosure, monetary harm due to inappropriate fees and charges assessed to her Loan account including broker price opinion fees, property inspection fees, *property preservation fees*, ~~breach~~ *foreclosure* fees, attorney's fees. But for the defendants' conduct, Plaintiff would not have suffered the described losses.

93.     *But for defendants' collective conduct, Plaintiff would have been able to obtain a permanent loan modification and keep the Property, or in the alternative, sell the Property free of debt via a short sale. Because of the time that the defendants have taken to "process" her loss mitigation application, and the manner in which they were processing her application, a HAMP modification is forever out of Plaintiff's reach. The Subject Property has been marked and being advertised to the world as being under foreclosure and Plaintiff is currently facing a judicial foreclosure which would expose to an enormous deficiency.*

## COUNT FIVE: RENEE M. PARKER VIOLATED THE CONSUMER PROTECTION ACT

94.     ~~86.~~     Defendant Renee M. Parker is an attorney licensed in a number of states, including the State of Washington. As such, Parker renders legal or advisory services to loan servicers and lenders and receives payments for such services. Parker's fees get charged to consumers' mortgage loan accounts and the borrower ultimately pays said fees either in curing

**B A R R A Z A   L A W   P L L C**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

the default or via a permanent loan modification. Because of Parker's specialty as a default/foreclosure lawyer, she is familiar with what the loan documents allow, or disallow for attorney's fees to be charged to the consumer account in the State of Washington as well as other states. Parker's billable practice occurs in trade or commerce.

95.    ~~87.~~    In this case, Parker was dealing with Plaintiff as unrepresented person in the context of a short sale request. Nowhere in the Deed of Trust executed by the Plaintiff does it allow for attorney's fee to be charged to the account in connection with the borrower's exercising a particular loss mitigation option. In fact, the services that Parker rendered and billed for work she did in Plaintiff's application for short sale were not legal services but work that can be performed by RCS' customer service personnel.  Yet, Parker submitted billable hours for legal services based on time she spent with Plaintiff in the context of loss mitigation, and got paid on these billing invoices.  Parker herself had never disclosed to Plaintiff that Plaintiff would incur attorney's fees in her dealing with Parker. Parker's failure to disclose how her practice affects the mortgage Loan account is both unfair and deceptive.

96.    ~~88.~~    Parker's billing as an attorney, in the context of mortgage servicing, including loss mitigation, impacts an important public interest, which is the interest of tens of thousands of homeowner-borrowers not to be burdened with improperly charged fees. Parker has engaged in this specific billing practice previously and a homeowner had been injured by such practice. Parker's billable practice has the potential of harming other homeowners-borrowers in the same manner that it did to Plaintiff and the borrower in <u>Lucero v. Cenlar.</u>

97.    ~~89.~~    Parker's billing practice has injured Plaintiff's directly property; its value has been lessened by the amount of attorney's fee billed by Parker and charged by RCS against the Loan.

**B A R R A Z A   L A W   P L L C**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

1    *98.    Upon information and belief, Parker's unfair and deceptive business practice*

2    *has not been limited to Plaintiff's loan, but also affects other borrowers who are similarly*

3    *situated. Parker's unfair and deceptive business practice as described herein have the capacity*

4    *of injuring other persons in the same manner that Plaintiff has been injured.*

5

6    **COUNT SIX: RCS , *BANA AND BONY* VIOLATED THE FAIR DEBT COLLECTION**
     **PRACTICES ACT**

7

8    99.    ~~90.~~    RCS came into being a debt collector in 2013 upon the servicing transfer

9    from BANA. Prior to the transfer, BANA had declared the Loan to be in default. Once the Loan

10   was on-boarded, RCS continued to declare the Loan to be in default and treated the Loan as

11   being of default status. RCS' declaration of default and its treatment of the Loan as default loan

12   rendered RCS a debt collector.  RCS regularly collected or attempted to collect, directly or

13   indirectly, debts owed or due or asserted to be owed or due to another by its business as a

14   default servicer of residential mortgage loans on behalf of others. RCS used the

15   instrumentalities of interstate commerce to do so including the use of United Postal Service, the

16   phone and the worldwide web. RCS does not own the Loan and was servicing it on behalf of

17   another. These factors rendered RCS a debt collector.

18   100.    ~~91.~~    By offering loan modifications and collecting modified payments, *BANA*

19   *and* RCS are ~~is a~~ debt collector*s* as determined by the Ninth Circuit in <u>Coverllo v. Wells Fargo</u>

20   <u>Bank</u>, 728 F.3d 878 (9th Cir. 2013). BANA and RCS' inducement to Plaintiff to apply for loan

21   modification and other loss mitigation options, *and their processing of the Plaintiff's*

22   *applications*, supports ~~RCS'~~  their status as ~~a~~ debt collector*s*.  *Further, BANA and RCS are debt*

23   *collectors because they are non-originating debt holders that either acquired the Loan in*

24   *default or treated the Loan to be in the default at the time of acquisition.*

**B A R R A Z A   L A W   P L L C**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

1     101. ~~92.~~ ~~In~~ *Between September 19 of 2015 and February 1 of 2016*, Plaintiff

2   received approximately 20 debt collection calls from RCS ~~regularly placed calls to Plaintiff in~~

3   ~~order to collect on the Loan~~. RCS called Plaintiff at home and at work during times or places

4   where it knew or should have known to be inconvenient for Plaintiff in violation of

5   §1692c(a)(1). RCS called Plaintiff's 80 year-old mother and her sister in-law and disclosed the

6   purpose of the call as debt collection call in violation of §1692b(2).  RCS, acting as a default

7   servicer, sent Plaintiff certain debt collection notices during the same period of time which were

8   false, deceptive and misleading in violation of §1692 e and e(2).  RCS sent Plaintiff numerous

9   debt collection notices informing Plaintiff of charges of attorney's fees incurred during the loss

10   mitigation process and not authorized by the Deed of Trust. RCS attempted to collect on these

11   fees by adding them into the total amount due and owing by the Plaintiff; this violated

12   §1692f(1).

13     102.    *On September 24, 2015, Plaintiff wrote to RCS notifying RCS that it had failed to*

14   *pay the taxes on the Subject Property, which are part of the claimed default amount for which*

15   *RCS demanded payment from the Plaintiff. It appears that as of September 24, 2015, even*

16   *though RCS assessed the cost of property taxes against the Loan, it did not pay the county as*

17   *the Kitsap County Treasure's website showed three years of delinquency. RCS' conduct violated*

18   *§§1692e(2)(B) and 1692f(1) prohibiting attempted collection of a fee that the creditor had not*

19   *incurred.*

20     103.    *BANA's ongoing attempt to collect from Plaintiff all amounts due, or the "payoff*

21   *amount," which include all fees unlawfully imposed by RCS previously upon the Loan, via*

22   *telephone, correspondence or through the impending judicial foreclosure filed by BONY,*

23   *violated 15 U.S.C. § 1692e, which prohibits "any false, deceptive, or misleading representation*

24

[**SECOND** AMENDED] COMPLAINT                    35

**B A R R A Z A   L A W   P L L C**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

1     *or means in connection with the collection of any debt." The violation concerns the "collection*

2     *of any amount" that is not "expressly authorized by the agreement creating the debt or*

3     *permitted by law." 15 U.S.C. § 1692f(1). This is a distinct provision of the FDCPA that*

4     *specifically defines a violation based on the actual collection of a debt and not a dated written*

5     *correspondence or telephone collection call. Section 1692f(1) which are subject to the one-year*

6     *statute of limitations. BANA's current and ongoing effort to collect from Plaintiff the payoff*

7     *amount constitutes "The collection of any amount (including any interest, fee, charge, or*

8     *expense incidental to the principal obligation) unless such amount is expressly authorized by*

9     *the agreement creating the debt or permitted by law." Plaintiff's particular claim is not time-*

10     *barred under the FDCPA.*

11     <u>**COUNT SEVEN: BANA AND RCS VIOLATED RESPA**</u>

12     104. ~~93.~~ Plaintiff's Loan is a federally related loan as it is a first lien attaches to

13     real property. The defendants BANA and RCS are subject to the Regulation because they are

14     not creditors making five or fewer mortgages in a year.

15     105. ~~94.~~ 12 C.F.R §§ 1024.35 concerning Notice of Error, and 1024.36 concerning

16     Request For Information, were promulgated pursuant to §6 of RESPA and are subject to

17     RESPA's private right of action entitling Plaintiff to actual damages and attorney's fees, and in

18     the case of a pattern or practice of noncompliance, statutory damages not to exceed $2000.

19     106. ~~95.~~ BANA violated the regulation when it failed to conduct a reasonable

20     investigation into the force-placed flood insurance pursuant to Plaintiff's written Notice of Error

21     dated June 1, 2016. Had it conducted a reasonable investigation, it would have discovered the

22     information provided by Plaintiff that her homestead is not in a flood zone, as determined by

23     FEMA map. Alternatively, if BANA in fact conducted an investigation and reached the

24

**B A R R A Z A   L A W   P L L C**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

1    conclusion that flood insurance was necessary, Plaintiff's production of the FEMA Map and

2    related information sufficiently refuted BANA's determination of the lack of any error.

3         107. ~~96.~~     As a direct and proximate cause of BANA's' refusal to provide Plaintiff

4    with the information she is entitled to under the above-described federal legislation, BANA has

5    deprived Plaintiff the opportunity to correct any errors in the Loan and precluded any effort by

6    her to address the payment obligations under the loan documents.

7                        **COUNT EIGHT: RCS VIOLATED RESPA**

8         108. ~~97.~~     RCS violated RESPA by refusing to provide Plaintiff with documents

9    substantiating the various fees, in particular, attorney's fees that it imposed on the Loan pursuant

10   to Plaintiff's RESPA requests made in March of 2015.

11        109. ~~98.~~     RCS violated RESPA for failing to timely respond to Plaintiff's Notice of

12   Error issued in September 2015. When RCS finally responded in November of 2015, it failed to

13   conduct a reasonable investigation into the items requested as evidenced by RCS' conclusory

14   statement that   "RCS is under no obligation to provide you with proof or documents."

15        110. ~~99.~~     As a direct and proximate cause of RCS' refusal to provide Plaintiff with

16   the information she is entitled under the above-described federal legislation, RCS has deprived

17   Plaintiff the opportunity to correct any errors in the Loan and precluded any effort by her to

18   address the payment obligations under the loan documents.

19

20                        **COUNT NINE: TORT OF OUTRAGE**

21        111. *To establish a tort of outrage claim, a plaintiff must show (1) extreme and*

22   *outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) severe*

23   *emotional distress on the part of the plaintiff. Outrageous conduct is conduct "which the*

24

[**SECOND** AMENDED] COMPLAINT                       37                **BARRAZA LAW PLLC**
                                                                        14245-F AMBAUM BLVD SW
                                                                        SEATTLE WA 98166
                                                                        Tel. 206-933-7861/Fax206-933-7863

1    *recitation of the facts to an average member of the community would arouse his resentment*

2    *against the actor and lead him to exclaim 'Outrageous!' " [1]*

3        112.    *BANA's conduct of inducing Plaintiff to stop making payments on the Loan in*

4    *order to be eligible for a loan modification was cruel, devious, and outrageous. BANA knew*

5    *that tens of thousands of borrowers, including Plaintiff, who suffered from financial setbacks*

6    *during the economic meltdown, desperately need to obtain a loan modification to save their*

7    *home; they would be willing to do whatever BANA tells them to do in order to qualify for a loan*

8    *modification, including the cessation of payments on their loan account.  Where BANA declared*

9    *the Loan to be in default following its inducement for Plaintiff to stop making payments, it set in*

10   *motion the process by which it knew that Plaintiff would lose her Property to foreclosure, rather*

11   *than being able to save it. Having been in possession of Plaintiff's personal and financial*

12   *information in the processing of the application for loan modification (which BANA urged*

13   *Plaintiff to supplement regularly with current documents), BANA knew that Plaintiff was*

14   *financially vulnerable and peculiarly susceptible to emotional distress based her fear of losing*

15   *the house to foreclosure.*

16       *113.    BANA has been intentionally stringing Plaintiff along knowing that the longer it*

17   *takes to process Plaintiff's application, the more dire her financial situation becomes. Where*

18   *Plaintiff was misled into thinking she had a chance, she in fact never had any real hope of a*

19   *loan modification, BANA's conduct was intentional, extreme, and devastating to Plaintiff's*

20   *mental psyche.*

21       *114.    When RCS took over the servicing of the Loan, it perpetuated the same myth that*

22

23   _____

24   [1] *Kloepfel v. Bokor*, 149 Wn.2d 192, 66 P.3d 630 (2003); *Reid v. Pierce County,* 136 Wn.2d 195, 961 P.2d 333
(1998).

[**SECOND** AMENDED] COMPLAINT                      38                    **BARRAZA LAW PLLC**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

*Plaintiff would be eligible for loss mitigation and demanded that Plaintiff start the application process all over again. RCS continued the charade by telling Plaintiff that her application material was not received, or if the material was received, it was incomplete.   Between September of 2013 and February of 2016, RCS sent Plaintiff "Notice of Default and Intent to Accelerate," as well as forms to fill out to be qualified for HAMP.  RCS induced Plaintiff to spend countless hours to fill out forms, assemble personal and financial documents and mail them to RCS via overnight delivery more than 20 times. While purportedly reviewing Plaintiff's application for loan modification, RCS was sending her monthly mortgage statements representing various charges which contributed to an ever increasing amount of arrearages on the Loan. Also, RCS called Plaintiff countless times at odd hours and several times on Sunday; it called Plaintiff's 80 year-old mother as well as Plaintiff's sister in-law causing shock and bewilderment on these individuals and shame and embarrassment on the part of the Plaintiff. Worst of all, RCS also issued "Pre-Foreclosure Notice" while talking to Plaintiff about a possible loan workout; these conflicting moves by RCS caused Plaintiff to go from the highest level of hope to deepest reach of despair; she felt she had no control whatsoever over her life and her destiny.*

*115.    RCS refused to grant Plaintiff a face-to-face meeting to discuss loss mitigation options. It forced Plaintiff to spend hundreds of hours talking on the phone with RCS' customer service personnel to gain information about her application. These individuals were dismissive of Plaintiff's need to save her home and they were personally rude to her. The information RCS provided to Plaintiff concerning her application were inaccurate, conflicting, or simply untrue. In fact, in one occasion when Plaintiff expressed dissatisfaction and promised to contest RCS's actions, Mr. Rowles, one of RCS' customer service members, taunted Plaintiff by saying she*

**B A R R A Z A   L A W   P L L C**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

1  *should add to her contest his unkind and demeaning treatment of her during to the call.  RCS*

2  *repeatedly refused to provide Plaintiff with proof of numerous charges it levied against her*

3  *Loan Account despite her asking. Finally, RCS caused for its agent, defendant NWTS, to nail a*

4  *Notice of Default on Plaintiff's back wall while she was supposedly being considered for loss*

5  *mitigation. Although Plaintiff's neighbors saw this Notice of Default, Plaintiff herself did not*

6  *find out until days later. Plaintiff was mortified by the incident and immediately wrote to RCS to*

7  *ferret out the information contained within the Notice of Default.  She sent a copy of her letter*

8  *via certified mail to defendant NWTS, defendant BANA, defendant BONY, and RCS at both of its*

9  *Error Resolution Center and Customer Relations Department and got nothing in response.*

10  *Throughout the three years that RCS acted as the servicer of the Loan, it ignored Plaintiff's plea*

11  *for information to rein in the Loan. RCS' exchanges with Plaintiff, as its "customer" were*

12  *lacking in the most human decency. Plaintiff has been made to feel humiliated, ashamed,*

13  *helpless and hopeless; she was no match for the defendants, in money, resources, or energy.*

14  *116.    BANA and RCS' collective actions have driven Plaintiff to the edge where she*

15  *thought of shooting herself in the head during one of these calls she made to their customer*

16  *service phone line. Plaintiff's dealings with these defendants manifested themselves into a*

17  *strange but serious medical condition whereupon the muscles in her abdominal, intestines and*

18  *surrounding nerves contracted, seized up into bundles and became "calcified." Plaintiff had to*

19  *endure six separate surgeries, she continued to be plagued by this mysterious and painful*

20  *medical condition where these calcified masses turned into three large tumors pressing against*

21  *her organs and causing internal hemorrhaging. Plaintiff had to endure the terrifying experience*

22  *of being tested for cancer and she underwent more surgical proceedings to remove these*

23  *tumors. As of the present, Plaintiff continues to receive treatment for this condition, which was*

24

[**SECOND** AMENDED] COMPLAINT                         40

**B A R R A Z A   L A W   P L L C**
14245-F AMBAUM BLVD SW
SEATTLE WA 98166
Tel. 206-933-7861/Fax206-933-7863

1 *caused by prolonged acute stress inflicted upon Plaintiff by the defendants.*

2 117. ~~100.~~ All the named defendants have acted in concert to divest Plaintiff of all

3 rights and interest she has in her homestead. By being in possession of all of Plaintiff's intimate

4 personal and financial information, and by dragging out the process of loss mitigation for so

5 long, BANA and RCS knew or should have known that (1) Plaintiff was peculiarly susceptible

6 to emotional distress, and (2) their mishandling of the mortgage loan and loan modification

7 would have affected her in a profound way as to inflict severe emotional distress as well as

8 serious medical conditions.

9 118. ~~101.~~ The defendants' actions as taken against Plaintiff have not been

10 inadvertent or accidental. Rather, they have been planned and executed by defendants on a

11 nationwide basis and have devastated many lives, including Plaintiff's own. For that reason, the

12 defendants' *modus operandi* ignores the very basic human decency, goes beyond all possible

13 bounds of decency and cannot be tolerated by a civilized society.

14 **COUNT TEN: DECLARATORY RELIEF, DEFENDANT BANK OF NEW YORK**

15 119. ~~102.~~ There is a substantial, actual, and continuing controversy between

16 Plaintiff and the defendant BONY concerning the conveyance, assignment, and/or transfer by

17 the original Lender, Northwest Mortgage Alliance, LLC of Plaintiff's Promissory Note and

18 Deed of Trust to the securitized trust for which BONY acts a trustee.

19 120. ~~103.~~ The Pooling and Servicing Agreement, which has never been produced

20 by BONY, and the applicable provisions of the Internal Revenue Code require that the transfer,

21 assignment, or conveyance by the original lender of Plaintiff's Promissory Note and Deed of

22 Trust, to BONY, must occur on or before the closing date of the trust, and in no event later than

23 ninety days thereafter. These requirements are under the trust laws of the State of New York

24

[**SECOND** AMENDED] COMPLAINT                    41

1   under which BONY, in its trustee capacity, was allegedly formed,

2       121.   ~~104.~~   There has been no proof that the transfer, assignment, or conveyance of

3   Plaintiff's Promissory Note and Deed of Trust to BONY, if occurred at all, was timely.

4       122.   ~~105.~~   Plaintiff requests a judicial declaration that (a) BONY must produce

5   proof that it "owns" or has the beneficial interest under the loan documents, and (2) BONY must

6   produce proof that the transfer, assignment or conveyance from the original lender to BONY

7   was timely, pursuant to the trust documents and the IRC, and (c) BONY must produce the

8   investors or owners' guideline for loss mitigation that its agents, representatives, assignors,

9   including BANA, RCS, Parker and NWTS must adhere to in consideration of Plaintiff's

10  application for loss mitigation.

11      123.   ~~106.~~   A judicial declaration is necessary and proper at this time and under these

12  circumstances so that the parties may determine their respective rights and duties regarding the

13  Loan and the Plaintiff's homestead.  Plaintiff is entitled to confirm the authority of the person or

14  entity with whom she could negotiate a resolution of the mortgage debt that has been rendered

15  nonperforming by defendant BANA since 2010.

16              **IV. PRAYER FOR RELIEF & DAMAGES**

17      Having stated her allegations and claims, LAURA L. TIMLICK prays the Court for the

18  following relief:

19      1.   For an award of General and Special Damages based on contract and tort claims

20  in an amount to be determined by proof at trial by jury;

21      2.   For an award of treble damages and attorney fees and costs under the WACPA;

22      3.   For an award of actual and statutory damages as well as attorney fees and costs

23  under FDCPA, RESPA, Regulation X, including emotional distress;

24

[**SECOND** AMENDED] COMPLAINT                42

4.      For proper accounting of all payments made;

5.      For prejudgment interests;

7.      For other additional relief the Court deems just and equitable

DATED this 8th day of June, 2017.

BARRAZA LAW, PLLC

*/s/ V. Omar Barraza*

VICENTE OMAR BARRAZA, WSBA 43589
Counsel for Plaintiff
14245-F Ambaum Blvd SW, Seattle WA 98166
206-933-7861 Fax 206-933-7863

[**SECOND** AMENDED] COMPLAINT                    43